1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                              )
8   JOSEPH JEROME WILBUR, *et al.*,      )        No. C11-1100RSL
                                                              )
9                                       Plaintiffs,      )
                                                              )        MEMORANDUM OF DECISION
10             v.                                          )
                                                              )
     CITY OF MOUNT VERNON, *et al.*,       )
11                                                           )
                                      Defendants.      )
12   _____ )

13

14        The Sixth Amendment to the United States Constitution provides that "[i]n all

15   criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for

     his defense."  Plaintiffs filed this lawsuit in Skagit County Superior Court in order to challenge
16
     the constitutional adequacy of the public defense system provided by the City of Mount Vernon
17
     and the City of Burlington.  The defendant municipalities removed the case to federal court on
18
     July 5, 2011.  Testimony on this matter was heard by the Court commencing on June 3, 2013,
19
     and concluding on June 18, 2013.  Additional briefing closed in August of 2013.[1]
20
          At trial, plaintiffs set out to prove that the Cities of Mount Vernon and Burlington
21
     are regularly and systematically failing to provide effective assistance of counsel to indigent
22
     persons charged with crimes, thereby violating both the federal and state constitutions and
23

24        ───────────────────────

25        [1]  In addition to the evidence presented at trial, the Court has considered the post-trial
     submissions of the parties, the Washington Defender Association, and the United States.  The "Motion
26   of Washington Defender Association For Leave to File Amicus Curiae Brief" (Dkt. # 321) is
     GRANTED.

     MEMORANDUM OF DECISION

1  necessitating injunctive relief.  Defendants took the position that, whatever defects may have

2  existed in their public defense systems before 2012, they have taken significant steps to improve

3  the representation provided, including contracting with a different law firm to provide defense

4  services, hiring additional public defenders, and paying them more.  The Court must determine

5  whether a constitutional right has been violated, whether the Cities are responsible for the

6  violation, and what the appropriate remedy is.

7  **FINDINGS OF FACT**

8          Plaintiffs have shown, by a preponderance of the evidence, that indigent criminal

9  defendants in Mount Vernon and Burlington are systematically deprived of the assistance of

10 counsel at critical stages of the prosecution and that municipal policymakers have made

11 deliberate choices regarding the funding, contracting, and monitoring of the public defense

12 system that directly and predictably caused the deprivation.  The period of time during which

13 Richard Sybrandy and Morgan Witt (hereinafter, Sybrandy and Witt) provided public defense

14 services for the Cities was marked by an almost complete absence of opportunities for the

15 accused to confer with appointed counsel in a confidential setting.  Most interactions occurred in

16 the courtroom:  discussions regarding possible defenses, the need for investigation, existing

17 physical or mental health issues, immigration status, client goals, and potential dispositions

18 were, if they occurred at all, perfunctory and/or public.  There is almost no evidence that

19 Sybrandy and Witt conducted investigations in any of their thousands of cases, nor is there any

20 suggestion that they did legal analysis regarding the elements of the crime charged or possible

21 defenses or that they discussed such issues with their clients.  Substantive hearings and trials

22 during that era were rare.  In general, counsel presumed that the police officers had done their

23 jobs correctly and negotiated a plea bargain based on that assumption.[2]  The appointment of

24

25          [2] When asked to explain why there were so few trials during his tenure as public defender, Mr.
26 Witt essentially said that trials were unnecessary because "we all knew where we were going."

MEMORANDUM OF DECISION                     -2-

1  counsel was, for the most part, little more than a formality, a stepping stone on the way to a case

2  closure or plea bargain having almost nothing to do with the individual indigent defendant.  To

3  the extent that "adequate representation" presumes a certain basic representational relationship,

4  there was a systemic failure in the Sybrandy and Witt era.  Adversarial testing of the

5  government's case was so infrequent that it was virtually a non-factor in the functioning of the

6  Cities' criminal justice system.

7          This situation was the natural, foreseeable, and expected result of the caseloads the

8  attorneys handled.  Sybrandy and Witt, both of whom also had private practices (Mr. Witt spent

9  only 40% of his time providing public defense services), each closed approximately 1,000 public

10  defense cases per year in 2009, 2010, and 2011 and often spent less than an hour on each case.

11  Although both counsel testified that they did not feel rushed or overworked, it is clear that, in

12  light of the sheer number of cases they handled, the services they offered to their indigent clients

13  amounted to little more than a "meet and plead" system.  While this resulted in a workload that

14  was manageable for the public defenders, the indigent defendants had virtually no relationship

15  with their assigned counsel and could not fairly be said to have been "represented" by them at

16  all.  The Cities, which were fully aware of the number of public defenders under contract,

17  remained wilfully blind regarding their overall caseloads and their case processing techniques.

18  The City officials who administered the public defense contracts did not feel it was necessary for

19  them to know how many non-public defense cases Sybrandy and Witt were handling, the

20  number of public defense cases they were assigned, or even whether the defenders were

21  complying with the standards for defense counsel set forth in the Cities' own ordinances and

22  contracts.  Even when Sybrandy and Witt expressly declined to provide basic services requested

23  by the Cities – such as initiating contact with their clients and/or visiting in-custody defendants –

24

25

26

MEMORANDUM OF DECISION                    -3-

1  the Cities were not particularly concerned.[3]  Eric Stendal, the contract administrator for the City

2  of Mount Vernon, testified that as long as things were "quiet and good" and there was no

3  significant increase in the costs the Cities incurred for their public defense system, defendants

4  were happy with the arrangement and continued to contract with Sybrandy and Witt.

5          After this lawsuit was filed, Sybrandy and Witt were no longer willing to provide

6  public defense services for the Cities.  The Cities issued a request for proposals and ultimately

7  hired Mountain Law to provide the necessary services.  Mountain Law came on-line in April

8  2012 with two attorneys.  The evidence regarding initial caseloads varies significantly:  the

9  Cities negotiated the new public defense contract on the assumption that over 1,700 cases would

10 be transferred from Sybrandy and Witt during the transition period, but Mountain Law's

11 caseload statistics show that it was assigned approximately 1,100 cases.  Whatever the true

12 numbers, it is clear that by the end of May each of the two public defenders was handling well

13 over 400 cases.  By the end of 2012, Mountain Law had added a third attorney and another 963

14 cases.  The Cities were kept apprised of these numbers.  They were also aware that, on June 15,

15 2012, the Supreme Court of Washington established 400 unweighted misdemeanor cases per

16 year as "the maximum caseload[] for fully supported full-time defense attorneys for cases of

17 average complexity and effort," assuming a "reasonably even distribution of cases throughout

18 the year."  Because the 400 caseload limit would not be effective until September 1, 2013,

19 neither Mountain Law nor the Cities were particularly concerned that Michael Laws and Jesse

20 Collins were each handling over 500 cases at any given time between April and August 2012.

21 The mantra during that period and continuing through trial was that Mountain Law would

22

23          [3]  While negotiating the public defense contract in 2008, Mr. Sybrandy notified the Cities that

24 "[t]here is much in the proposed contract which is not possible for us to comply with, at least at the level
   of compensation we have proposed." Tr. Ex. 36.  Rather than raise the level of compensation to obtain

25 the level of services required under Ordinance 3436 and, by extension, the standards endorsed by the
   Washington State Bar Association for the provision of public defense services, the Cities simply struck

26 or ignored requirements related to, among other things, client interactions and reporting/monitoring.

MEMORANDUM OF DECISION                      -4-

continue to work toward the 400 annual caseload limit by adding attorneys as needed.  As of the time of trial, Mountain Law had added two additional attorneys (one in August 2012 and another in March 2013), presumably reducing the per attorney caseload to some extent.  The preponderance of the evidence shows, however, that Mountain Law continues to handle caseloads far in excess of the per attorney limits set forth in the Supreme Court's guidelines.[4]

The Court does not presume to establish fixed numerical standards or a checklist by which the constitutional adequacy of counsel's representation can be judged.  The experts, public defenders, and prosecutors who testified at trial made clear that there are myriad factors that must be considered when determining whether a system of public defense provides indigent criminal defendants the assistance required by the Sixth Amendment.  Factors such as the mix and complexity of cases, counsel's experience, and the prosecutorial and judicial resources available were mentioned throughout trial.  The Washington Supreme Court took many of the relevant factors into consideration when it imposed a hard cap on the number of cases a public defender can handle over the course of a year:[5]  the 400 caseload limit applies as long as counsel

---

[4]  The parties generally agree that the Standards for Indigent Defense adopted by the Washington Supreme Court provide a sort of best practices to which the Cities aspire.  The evidence in the record strongly suggests that, even with the addition of Sade Smith and Stacy DeMass to the public defender ranks, defendants still run afoul of the per annum limitation.  The question is not whether, on any particular day, a public defender has more or less than 400 open cases.  No attorney can reasonably be expected to handle 400 criminal cases at once.  Pursuant to the Standards, the goal is to have no more than 400 cases assigned to each public defender over the course of an entire year, with the assignments temporally spaced so that he or she can give each client the representation that is constitutionally required.  Mountain Law opened 2,070 cases between April and December 2012 – even if all four attorneys had been on board during the entire period (and they were not), they would have far exceeded the Supreme Court's guidelines.

[5]  The Washington Defender Association ("WDA"), a statewide organization of public defenders and public defender agencies that first proposed the caseload limits, argues that:

Caseload levels are the single biggest predictor of the quality of public defense representation. Not even the most able and industrious lawyers can provide effective representation when their workloads are unmanageable. Without reasonable caseloads,

MEMORANDUM OF DECISION                    -5-

1  handles only misdemeanor cases, is employed full-time in public defense, is handling cases of

2  average complexity and effort, counts every matter to which he or she is assigned to provide

3  representation,[6] is fully supported, and has relevant experience.  Where counsel diverges from

4  these assumptions, the caseload limit must be lowered in an attempt to protect the quality of the

5  representation provided.

6         While a hard caseload limit will obviously have beneficial effects and the

7  Washington Supreme Court's efforts in this area are laudable, the issue for this Court is whether

8  the system of public defense provided by the defendant municipalities allows appointed counsel

9  to give each case the time and effort necessary to ensure constitutionally adequate representation

10  for the client and to retain the integrity of our adversarial criminal justice system.  Mount

11  Vernon and Burlington fail this test.  Timely and confidential input from the client regarding

12  such things as possible defenses, the need for investigation, mental and physical health issues,

13  immigration status, client goals, and potential dispositions are essential to an informed

14  representational relationship.  Public defenders are not required to accept their clients'

15  statements at face value or to follow every lead suggested, but they cannot simply presume that

16  the police officers and prosecutor have done their jobs correctly or that investigation would be

17  futile.  The nature and scope of the investigation, legal research, and pretrial motions practice in

18  a particular case should reflect counsel's informed judgment based on the information obtained

19

20         even the most dedicated lawyers cannot do a consistently effective job for their clients.
        A warm body with a law degree, able to affix his or her name to a plea agreement, is not

21      an acceptable substitute for the effective advocate envisioned when the Supreme Court
        extended the right to counsel to all persons facing incarceration.

22

23  WDA 2007 Final Standards for Public Defense Services with Commentary at 13
   (http://www.defensenet.org/about-wda/standards).

24
       [6] If the Cities adopt a numerical case weighting system that recognizes the greater or lesser

25  workload required for various types of cases (and therefore more accurately estimates workload rather
   than just case counts), the Supreme Court's standards would limit each public defender to 300 weighted

26  misdemeanor cases.

MEMORANDUM OF DECISION              -6-

through timely and confidential communications with the client.  A failure of communication precludes the possibility of informed judgment.  If actual, individualized representation occurs – as opposed to a meet and plead system – the systemic result is likely to be more adversarial testing of the prosecutor's case throughout the proceeding and a healthier criminal justice system overall.  Again, no hard and fast number of pretrial motions or trials is expected, but when the number of cases going to trial is both incredibly small (in absolute and comparative terms) and wildly out of line with the number of trials that occurred in nearby (and sometimes overlapping) jurisdictions, it may be, and in this case is, a sign of a deeper systemic problem.

A number of defendants' witnesses, including former Pierce County Executive and Prosecutor John Ladenburg, pointed out that the adequacy of counsel cannot fairly be judged in a vacuum:  the Court must also take into consideration the resources available to the other side.  If, in a time of fiscal constraint, the prosecutor is also overwhelmed and/or the municipal jail cannot accommodate any more inmates, the resulting plea offers are likely to be as good as or better than the public defender could negotiate even if he or she spent untold hours on legal research and investigation.[7]  The Court does not dispute the fact that many, if not the vast majority, of the plaintiff class obtained a reasonable resolution of the charges against them.  The problem is not the ultimate disposition:  if plaintiffs were alleging that counsel had affirmatively erred and obtained a deleterious result, the Sixth Amendment challenge would have been brought under Strickland v. Washington, 466 U.S. 668 (1984), rather than Gideon v. Wainwright, 372 U.S. 335

---

[7]  It is clear from the testimony of a former city attorney assigned to prosecute misdemeanor cases for one of the municipalities that the people of the City received even more ineffective representation than the individuals charged with crimes.  There is no constitutional right regarding the quality of the people's lawyer, however, and the Court is not in a position to address the negative impacts that budgetary constraints have had on any part of the criminal justice system other than the provision of indigent defense.  While the city attorney's willingness to grant overly-lenient plea agreements may explain Sybrandy and Witt's determination that investigation, research, and communication were unnecessary impediments to the expeditious resolution of their cases, it does not excuse their consistent failure to establish a meaningful attorney/client relationship with the people they represented.

MEMORANDUM OF DECISION                         -7-

1   (1963).  The point here is that the system is broken to such an extent that confidential

2   attorney/client communications are rare, the individual defendant is not represented in any

3   meaningful way, and actual innocence could conceivably go unnoticed and unchampioned.

4   Advising a client to take a fantastic plea deal in an obstruction of justice or domestic violence

5   case may appear to be effective advocacy, but not if the client is innocent, the charge is

6   defective, or the plea would have disastrous consequences for his or her immigration status.  It is

7   the lack of a representational relationship that would allow counsel to evaluate and protect the

8   client's interests that makes the situation in Mount Vernon and Burlington so troubling and gives

9   rise to the Sixth Amendment violation in this case.

10          Given the fiscal constraints imposed on both sides of the criminal justice equation

11  in Mount Vernon and Burlington, it is not surprising that the Mountain Law attorneys had to

12  adopt some of the same time-saving and "efficient" case management practices that dominated

13  the Sybrandy and Witt era in order to handle the caseload they inherited in April 2012 and the

14  additional cases that have been assigned to them each and every month thereafter.  The evidence

15  is clear that Mountain Law, while more willing to conduct an initial interview with their clients,

16  is simply unable to do so in a majority of cases.  Although Mountain Law staff schedule a

17  meeting with the client as soon as the case is assigned, the attorneys' courtroom and other

18  commitments often make it impossible to hold the meeting before the client's first appearance.

19  Thus, the public defenders often meet their clients for the first time in the courtroom, sometimes

20  with a plea offer already in hand.  At that point, there is really no opportunity for a confidential

21  interview, the client may or may not understand the proceedings, and the public defender is

22  unprepared to go forward on the merits of the case.  The client is given a choice between

23  continuing the hearing so he or she can meet with the public defender or to accept whatever offer

24

25

26

MEMORANDUM OF DECISION                    -8-

1   happens to be on the table.[8]  While there is some evidence of investigations, legal research, and

2   an uptick in the number of cases set for trials in Mount Vernon and Burlington since Mountain

3   Law took over, the numbers are still shockingly low.  Mr. Laws apparently spoke to only three

4   or four witnesses in the whole of 2012, a review of fifty Mountain Law case files showed no

5   documentation of any legal analysis or research, and there is evidence of only one pre-trial

6   motion and five or six trials in 2012.

7          The Court finds that, as of the date of trial, the representation provided to indigent

8   defendants in Mount Vernon and Burlington remains inadequate.  The Court would have to

9   make several unsupported assumptions regarding Mountain Law's ability to clear the backlog of

10  cases it inherited, the distribution of cases within the office, counsels' experience and

11  proficiency, and the number of new cases opened each month to conclude that the defenders'

12  current caseloads allow the kind of individualized client representation that every indigent

13  criminal defendant deserves and on which our adversarial system of criminal justice depends.

14  Even if the Court were willing to make those assumptions, there is no evidence that Mountain

15  Law has rethought or restructured the case management procedures that were developed during

16  the first few hectic months of its contract with the Cities.  Rather than providing an opportunity

17  for a representational relationship to develop and following up as appropriate given the facts of

18  each case, Mountain Law allowed the massive caseload to determine the level of representation

19

20          [8]  Defendants made much of the fact that other professionals involved in the criminal justice
21  system – the judges and prosecutors – did not see anything wrong with the representation provided in
    any particular case.  As the Court has already noted, the result obtained in an individual case would
22  likely appear reasonable, especially when the client assures the presiding judicial officer that he or she is
    making a knowing and informed decision to plead guilty.  But what the judges and prosecutors had no
23  way of knowing was whether the client ever had a chance to meet with the public defender in a
    confidential setting, whether the attorney conducted an investigation or knew anything about the case
24  other than what was in the charging document and/or police report, or whether a meaningful
    attorney/client relationship actually existed.  No indigent criminal defendant testified that they enjoyed a
25  representational relationship with Sybrandy, Witt, or Mountain Law, despite having positive things to
26  say about certain conflict counsel and/or the Skagit County public defenders.

MEMORANDUM OF DECISION                    -9-

that would be afforded and has continued those practices even after adding additional attorneys.

The Court's findings should not be interpreted as an indictment of Mountain Law, its attorneys, or their legal acumen.  The Court is encouraged by some of the changes Mountain Law is making in Mount Vernon and Burlington:  the public defense system is definitely trending in the right direction, and the Court sees great promise in Mountain Law's dedicated young lawyers.  By accepting a contract with the Cities of Mount Vernon and Burlington, however, Mountain Law became embroiled in an ongoing debate regarding the adequacy of our public defense systems in times of fiscal constraint and the meaning of the right to counsel fifty years after it was promised in Gideon v. Wainwright, 372 U.S. 335 (1963).  Although the right to the assistance of counsel regardless of economic status is established by the Constitution, legislative enactments are required to ensure that the right is maintained, and funding limitations imposed over the past few years are having a cumulative and adverse impact at both the state and national levels.[9]  In the State of Washington, there are undoubtedly a number of municipalities

---

[9]  The federal judiciary's system of indigent public defense services, long considered the gold standard in the United States, has been adversely affected by successive years of reduced budgets and the 2013 sequestration cuts.  For the first time, federal public defenders were forced to take furlough days, making them unavailable to their clients and unable to attend court hearings.  More cases were shifted to private lawyers, whose pay was reduced and delayed in an effort to cut costs.  On November 6, 2013, fifty-eight Members of Congress sent a letter to the Speaker of the House and the Minority Leader indicating their grave concern that the underfunding of public defense at the federal level was placing the Sixth Amendment right to counsel in jeopardy (http://quigley.house.gov/uploads/FederalDefenderLetter1.pdf ).

At the intersection of staggering caseloads and insufficient resources we even find federal courts struggling to justify procedures that simply do not hold up under constitutional scrutiny.  For instance, United States Magistrate Judges in Arizona faced with an explosion in the number of illegal entry cases across the Mexican border started doing "mass" plea proceedings with up to seventy defendants pleading guilty at the same time.  United States v. Arqueta-Ramos, 730 F.3d 1133, 1135-36 (9th Cir. 2013).  During one such hearing, there were fifteen defense attorneys present, each representing between three and five defendants.  Id. at 1136.  The court advised the large group of defendants of their rights and then questioned them in groups of five, collectively asking questions to ascertain whether they understood their rights and the consequences of pleading guilty.  Id. at 1139.  The Ninth Circuit Court of Appeals struck down the court's collective group questioning because the court did not address any defendant personally during its advisement of rights or the small group questioning.  Id. ("We act

---

MEMORANDUM OF DECISION                    -10-

whose public defense systems would, if put under a microscope, be found wanting.  As defense counsel rightly pointed out, this is a test case that cannot properly be laid at Mountain Law's door.  It was the confluence of factors in place in Mount Vernon and Burlington in 2011 - long before Mountain Law began providing public defense services - that brought the Cities to the attention of the ACLU and prompted this Sixth Amendment challenge.

## CONCLUSIONS OF LAW

**A.  Right to Counsel**

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[10]  Such assistance is vital to the proper functioning of our criminal justice system: in the absence of adequate representation, the prosecution's case may not be subjected to meaningful adversarial testing and the defendant may be unable to assert other rights he may have or to pursue valid defenses.  U.S. v. Cronic, 466 U.S. 648, 654, 659 (1984).  See also Powell v. Alabama, 287 U.S. 45, 68-69 (1932) ("The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.  Even the intelligent and educated layman has small and sometimes no skill in the science of law.  If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad.  He is unfamiliar with the rules of evidence.  Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.  He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one.  He requires the guiding hand of counsel at every

---

within a system maintained by the rules of procedure.  We cannot dispense with the rules without setting a precedent subversive of the structure." (quoting United States v. Roblero-Solis, 588 F.3d 692, 693 (9th Cir. 2009)).

[10]  Plaintiffs have also asserted a claim under Article I, Section 22 of the Washington State Constitution.  Because the parties did not offer any evidence or legal argument peculiar to that claim, it has not been separately analyzed.

MEMORANDUM OF DECISION                    -11-

step in the proceedings against him.  Without it, though he be not guilty, he faces the danger of

conviction because he does not know how to establish his innocence.").  The United States

Supreme Court has determined that the right to counsel is "fundamental and essential to a fair

trial" and applies in both federal and state proceedings.  Gideon v. Wainwright, 372 U.S. 335,

343-44 (1963) ("[I]n our adversary system of criminal justice, any person haled into court, who

is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.

This seems to us to be an obvious truth.").

Despite the broad language of the Sixth Amendment, Powell, and Gideon, it was

not until 1972 that the Supreme Court made clear that the right to counsel extends to all cases in

which the accused may be deprived of his liberty, whether characterized as a felony or a

misdemeanor.  In Argersinger v. Hamlin, 407 U.S. 25, 33 (1972), the Supreme Court noted that

the legal and constitutional questions involved in the prosecution of petty offenses are not

necessarily any less complex than those that arise in felony cases.  In addition, the sheer volume

of misdemeanor cases may give rise to unique procedural challenges that threaten the fairness of

the criminal justice system:

> The volume of misdemeanor cases, far greater in number than felony prosecutions,
> may create an obsession for speedy dispositions, regardless of the fairness of the
> result. . . .  An inevitable consequence of volume that large is the almost total
> preoccupation in such a court with the movement of cases.  The calendar is long,
> speed often is substituted for care, and casually arranged out-of-court compromise
> too often is substituted for adjudication.  Inadequate attention tends to be given to
> the individual defendant, whether in protecting his rights, sifting the facts at trial,
> deciding the social risk he presents, or determining how to deal with him after
> conviction. . . .  Suddenly it becomes clear that for most defendants in the criminal
> process, there is scant regard for them as individuals.  They are numbers on
> dockets, faceless ones to be processed and sent on their way.  The gap between the
> theory and the reality is enormous. . . . One study concluded that misdemeanants
> represented by attorneys are five times as likely to emerge from police court with
> all charges dismissed as are defendants who face similar charges without counsel.

Id. at 34-36 (internal quotation marks and citations omitted).  The Washington Supreme Court

MEMORANDUM OF DECISION                          -12-

1  recognized the primacy of the Argersinger decision in McInturf v. Horton, 85 Wn.2d 704, 707

2  (1975), overruling an earlier opinion that held there was no right to appointment of counsel in

3  misdemeanor prosecutions.  See also Washington Criminal Rule for Courts of Limited

4  Jurisdiction 3.1 ("The right to a lawyer shall extend to all criminal proceedings for offenses

5  punishable by loss of liberty regardless of their denomination as felonies, misdemeanors, or

6  otherwise.").

7         Mere appointment of counsel to represent an indigent defendant is not enough to

8  satisfy the Sixth Amendment's promise of the assistance of counsel.  While the outright failure

9  to appoint counsel will invalidate a resulting criminal conviction, less extreme circumstances

10  will also give rise to a presumption that the outcome was not reliable.  For example, if counsel

11  entirely fails to subject the prosecution's case to meaningful adversarial testing, if there is no

12  opportunity for appointed counsel to confer with the accused to prepare a defense, or

13  circumstances exist that make it highly unlikely that any lawyer, no matter how competent,

14  would be able to provide effective assistance, the appointment of counsel may be little more than

15  a sham and an adverse effect on the reliability of the trial process will be presumed.  Cronic, 466

16  U.S. at 658-60; Avery v. Alabama, 308 U.S. 444, 446 (1940).

17  **B.  Municipal Liability under Section 1983**

18         Under 42 U.S.C. § 1983, a municipality is a person and may therefore be liable for

19  a constitutional deprivation.  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir.

20  2006).[11]  Although a municipality may not be sued under § 1983 simply because an employee

21  inflicted constitutional injury, where the injury is the result of a policy or custom of the

22  municipality, the injury-generating acts are "properly speaking, acts of the municipality – that is,

23  acts which the municipality has officially sanctioned or ordered."  Pembauer v. City of

24  ───────────────

25  [11]  Plaintiffs are not suing the individual public defenders for the way in which they performed a
    lawyer's traditional functions (a claim likely precluded by Polk County v. Dodson, 454 U.S. 312, 325
26  (1981)).

MEMORANDUM OF DECISION          -13-

1    Cincinnati, 475 U.S. 469, 480 (1986) (internal quotation marks omitted).  Discrete decisions by a

2 government official with ultimate authority over the matter in question generally give rise to

3 official municipal policy for purposes of § 1983.  Id. at 480-81.

4           The Court finds that the public defense system in Mount Vernon and Burlington

5 has systemic flaws that deprive indigent criminal defendants of their Sixth Amendment right to

6 the assistance of counsel.  Although counsel are appointed in a timely manner, the sheer number

7 of cases has compelled the public defenders to adopt case management practices that result in

8 most defendants going to court for the first time – and sometimes accepting a plea bargain –

9 never having had the opportunity to meet with their attorneys in a confidential setting.  The

10 attorney represents the client in name only in these circumstances, having no idea what the

11 client's goals are, whether there are any defenses or mitigating circumstances that require

12 investigation, or whether special considerations regarding immigration status, mental or physical

13 conditions, or criminal history exist.  Such perfunctory "representation" does not satisfy the

14 Sixth Amendment.  See Strickland, 466 U.S. at 691 (counsel have a Sixth Amendment duty to

15 conduct a reasonable investigation or to make a decision, based "on informed strategic choices

16 made by the defendant and on information supplied by the defendant," that a particular

17 investigation is unnecessary); Cronic, 466 U.S. at 658-60; Avery, 308 U.S. at 446; Powell, 287

18 U.S. at 58 ("It is not enough to assume that counsel thus precipitated into the case thought there

19 was no defense, and exercised their best judgment in proceeding to trial without preparation.

20 Nether they nor the court could say what a prompt and thorough-going investigation might

21 disclose as to the facts."); Hurrell-Harring v. State of New York, 930 N.E.2d 217, 224 (N.Y.

22 2010) (recognizing that "[a]ctual representation assumes a certain basic representational

23 relationship," such that the failure to communicate and/or appear at critical stages of the

24 prosecution may be reasonably interpreted as nonrepresentation rather than ineffective

25 representation).

26           Having found that plaintiffs' Sixth Amendment rights were violated, the Court

MEMORANDUM OF DECISION        -14-

must determine whether the Cities are responsible for the constitutional deprivation.  Plaintiffs have shown that the constitutional deprivations at issue here were the direct and predictable result of the deliberate choices of City officials charged with the administration of the public defense system.  Intentional choices made while negotiating the public defender contracts and allocating funds to the public defender system left the defenders compensated at such a paltry level that even a brief meeting at the outset of the representation would likely make the venture unprofitable.  And the Cities knew it.  When Mountain Law took over the public defense contract, the Cities estimated there would be approximately 1,700 cases transferred from Sybrandy and Witt and yet chose a proposal pursuant to which they would pay only $17,500 per month.  That works out to $10 per case for April 2012, with the per case rate reduced in future months by each additional case assigned to Mountain Law.  Mountain Law had (and still has) every incentive to close cases as quickly as possible and to minimize the time spent on each case.  While every attorney, whether privately or publicly retained, must be cognizant of costs when choosing a course of action, defending an indigent criminal defendant – any indigent criminal defendant – on $10 per month inclusive of staff, overhead, and routine investigation costs makes it virtually impossible that the lawyer, no matter how competent or diligent, will be able to provide effective assistance.[12]

        Legislative and monitoring decisions made by the policymaking authorities of the Cities ensured that any defects in the public defense system would go undetected or could be easily ignored.  Despite receiving monthly reports listing case assignments, types of cases, dispositions, and hours worked on each case, the administrators made no effort to calculate the number of cases assigned to Mountain Law or to evaluate the nature or extent of the services provided under the contract.  After this litigation was filed, the City of Mount Vernon twice

---

[12] The Court recognizes that approximately 1,100 cases were transferred from Sybrandy and Witt to Mountain Law, making the actual pay per case closer to $16 for April 2012.  Nevertheless, the conclusion that the Cities knowingly underfunded their public defense system remains inescapable.

MEMORANDUM OF DECISION                    -15-

amended its ordinance related to the provision of public defender services, both times removing what little "teeth" the previous ordinances had.  For example, in January 2012, the City jettisoned its previously acknowledged obligation to develop "a procedure for systematic monitoring and evaluation of attorney performance based on published criteria" in favor of a newly-found concern that such monitoring and evaluation "is not practical nor consistent with attorney/client privilege nor the constitutional rights of indigent defendants."  Tr. Exs. 45 and 147.  In November 2012, Mount Vernon deleted references to specific duties of the public defenders, redefined "case" to exclude from the caseload calculation matters that would clearly count toward the 400 unweighted limit under the Supreme Court's Standards for Indigent Defense, and removed the requirement that the public defenders report hours worked on and the disposition of each case.

The Court finds that the combination of contracting, funding, legislating, and monitoring decisions made by the policymaking authorities for the Cities directly caused the truncated case handling procedures that have deprived indigent criminal defendants in Mount Vernon and Burlington of private attorney/client consultation, reasonable investigation and advocacy, and the adversarial testing of the prosecutor's case.  The Cities are therefore liable under § 1983 for the systemic Sixth Amendment violation proved by plaintiffs.  See Miranda v. Clark County, 319 F.3d 465 (9th Cir. 2003) (finding that county could be liable for constitutional deprivations arising from funding and case assignment policies); Clay v. Friedman, 541 F. Supp. 500, 502, 505-06 (N.D. Ill. 1982) (finding that administrative head of public defender's office could be liable for non-representative decision-making and that county could be liable for promulgating policies and customs that led to the constitutional deprivation).[13]

_____

[13]  To the extent Gausvik v. Perez, 239 F. Supp.2d 1047, 1065 (E.D. Wash. 2002), stands for the proposition that hiring an independent contractor, such as Mountain Law, to provide public defense services discharges a municipality's Sixth Amendment obligations, the Court finds it unpersuasive and unsupported by the cited authorities.

MEMORANDUM OF DECISION                    -16-

1   **C.  Injunctive Relief**

2            Plaintiffs have succeeded on the merits of their claim, establishing both a systemic

3   deprivation of the right to the assistance of counsel and the Cities' responsibility for the

4   deprivation.[14]  In order to obtain injunctive relief, plaintiffs must also show irreparable injury

5   and the inadequacy of available legal remedies.  Sierra Club v. Penfold, 857 F.2d 1307, 1318

6   (9th Cir. 1988).  This burden is easily met here.  A system that makes it impossible for appointed

7   counsel to provide the sort of assistance required by the Sixth Amendment works irreparable

8   harm:  the lack of an actual representational relationship and/or adversarial testing injures both

9   the indigent defendant and the criminal justice system as a whole.  The exact impacts of the

10  constitutional deprivation are widespread but difficult to measure on a case by case basis,

11  making legal remedies ineffective.  See Walters v. Reno, 145 F.3d 1031, 1048 (9th Cir. 1998).

12           This Court has broad authority to fashion an equitable remedy for the

13  constitutional violations at issue in this case.  Swann v. Charlotte-Mecklenburg Bd. of Educ.,

14  402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district

15  court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent

16  in equitable remedies.").  The Court has considered whether merely declaring that a

17  constitutional right has been violated would be enough to work a change in defendants' conduct,

18  such that affirmative injunctive relief would be unnecessary.  Having carefully considered the

19  testimony of the Cities' officials and reviewed the recent legislative and contractual

20  developments, the Court has grave doubts regarding the Cities' ability and political will to make

21  the necessary changes on their own.  The Cities' unwillingness to accept that they had any duty

22  to monitor the constitutional adequacy of the representation provided by the public defenders,

23  their steadfast insistence that the defense services offered by Sybrandy and Witt were not just

24

25           [14]  In Farrow v. Lipetzky, 2013 WL 1915700 (N.D. Cal. May 8, 2013), the case defendants cite
    for the proposition that a federal court has declined to use its equitable powers to monitor a public
26  defense agency, the court found that no Sixth Amendment violation had occurred.

MEMORANDUM OF DECISION                         -17-

1   adequate, but "outstanding," their surprisingly slow response to the pendency of this litigation

2   and the Supreme Court's adoption of specific caseload limits, and their budgetary constraints all

3   lead to the conclusion that a declaration will not be sufficient to compel change.

4            The Court is sensitive to the Cities' interests in controlling the manner in which

5   they perform their core functions, including the provision of services and the allocation of scarce

6   resources.  Having chosen to operate a municipal court system, however, defendants are

7   obligated to comply with the dictates of the Sixth Amendment, and the Court will "not shrink

8   from [its] obligation to enforce the constitutional rights of all persons."  Brown v. Plata,  __ U.S.

9   __, 131 S. Ct. 1910, 1928 (2011) (internal quotation marks omitted).  A continuing injunction is

10  hereby entered against defendants as follows:

11           –       Within seven days of the date of this Order, the officials charged with

12  administering the public defense contracts in Mount Vernon and Burlington and all full- and

13  part-time public defenders in those municipalities shall read the Washington Defender

14  Association's 2007 Final Standards for Public Defense Services with Commentary

15  (http://www.defensenet.org/about-wda/standards).

16           –       The Cities of Mount Vernon and Burlington shall, within thirty days of the date of

17  this Order, re-evaluate their existing contract for the provision of public defense in light of the

18  Court's findings and ensure that the document encourages and is no way antithetical to a public

19  defense system that allows for private attorney/client communications at the outset of the

20  relationship and the ability to follow up as appropriate given the circumstances, including the

21  client's status, input, and goals.  While the standards adopted by the Washington Supreme Court

22  and the experiences of the Washington Defender Association will undoubtedly inform any

23  evaluation of the adequacy of defendants' system going forward, the constitutional benchmark

24  cannot be reduced to a number, and the Court declines to adopt a hard caseload limitation.  The

25  critical issue is whether the system provides indigent criminal defendants the actual assistance of

26  counsel, such that defendants have the opportunity to assert any rights or defenses that may be

1  available to them and appropriate adversarial testing occurs.

2  –   The Cities shall hire one part-time Public Defense Supervisor to work at least

3  twenty hours per week.  The Public Defense Supervisor may be either a contractor or a part-time

4  employee, but the funds for this position shall not come out of the existing budget for public

5  defense services.  The parties shall have sixty days from the date of this Order to reach

6  agreement on selection of a Public Defense Supervisor. The Public Defense Supervisor will be

7  part of the attorney/client confidential relationship between Mountain Law and its clients, but

8  will not be part of the Mountain Law firm.  The Public Defense Supervisor may not have worked

9  previously for the Cities, Mountain Law, Baker Lewis, or any of the Cities' witnesses or

10  attorneys.  The Public Defense Supervisor must have a minimum of five years of experience as a

11  public defender, including jury trial experience.  If the parties fail to reach agreement within

12  sixty days from the date of this Order, each side shall submit the names and resumes of two

13  candidates willing to serve as the Public Defense Supervisor to the Court, which will then select

14  the Public Defense Supervisor.

15  –   The duties of the Public Defense Supervisor shall include:

16  1.  Supervision and evaluation of whether the public defenders are making contact

17  (in-person or by phone) in a confidential setting with each new client within 72 hours of

18  appointment.  If contact cannot be made within that time period, the Public Defense Supervisor

19  shall document the reason(s) for the failure and whether an opportunity for confidential

20  communications occurred prior to the client's first court hearing.  The Public Defense Supervisor

21  will also take steps to ensure that the public defenders perform the following tasks when they

22  first meet with a client following a new case assignment: (i) advise the client of the right to jury

23  trial and right to a speedy trial; (ii) advise the client of the elements of the charge and that the

24  prosecutor must prove each element beyond a reasonable doubt to obtain a conviction;

25  (iii) advise the client of the right to present a defense; (iv) advise the client that it is solely the

26  client's decision whether to accept or reject any plea offer; and (v) discuss with the client any

MEMORANDUM OF DECISION                    -19-

potential witnesses or avenues of investigation.

2.  Monthly supervision and evaluation of the first contact with clients, documenting whether the public defenders are determining if each client: (i) appears competent to proceed with the court process; (ii) has a sufficient literacy level to understand written court documents such as the guilty plea form and sentencing orders; (iii) needs an interpreter; and (iv) is a non-citizen in need of expert immigration advice from the WDA or another source.

3.  Monthly supervision and evaluation of whether the public defenders are responding appropriately to information provided by the client and discovery obtained in each case, including pursuing additional discussions with the client, investigations, medical evaluations, legal research, motions, etc., as suggested by the circumstances.

4.  Establishing a policy for public defenders to respond to all client contacts and complaints (including jail kites), including the length of time within which a response must occur.  The Public Defense Supervisor shall review any and all client complaints obtained from any source and the public defender's response.  Use or non-use of any particular complaint process shall in no way be considered a waiver of the client's rights.  The Public Defense Supervisor shall establish a process for clients to pursue a complaint if the Public Defense Supervisor fails to resolve it to the client's satisfaction.

5.  Monthly supervision and evaluation of whether the public defenders are appropriately using interpreters and translators before any decisions are made by the client.

6.  Supervision and evaluation of courtroom proceedings to ensure that the public defenders are fulfilling their role as advocate before the court on the client's behalf.

7.  Supervision and evaluation of whether the public defenders are fully advising clients of their options regarding possible dispositions, including information on treatment services, any options for a less onerous disposition based on treatment, explanations of plea offers, the consequences of a conviction, conditions that are normally imposed at sentencing, any applicable immigration consequences, and any other consequences about which the client has

1    expressed concern.

2         8.  Supervision and evaluation of whether the public defenders are maintaining

3    contemporaneous records on a daily basis showing the amount of time spent on each task for

4    each case, recorded in tenth-of-an-hour increments.

5         9.  Quarterly supervision and evaluation of whether cases are being allocated to

6    each public defender fairly and in consideration of existing workloads, the seriousness of the

7    charge(s), any factors that make the case more complex or time-consuming, and the attorney's

8    experience level.

9         10.  Quarterly selection and review of fifteen randomly chosen files from each

10   public defender to ensure that the necessary tasks are being performed and documented, with

11   appropriate time being spent on each task. The Public Defense Supervisor shall conduct a

12   quarterly meeting with each public defender to advise how their performance can be improved

13   based on the file review.

14        11.  Collecting data on a quarterly basis showing: (i) the frequency of use of

15   investigators and expert witnesses; (ii) the number of motions on substantive issues that are filed

16   and the outcome of each motion; (iii) the frequency with which cases are resolved by outright

17   dismissal or a nonconviction disposition; (iv) the frequency of pleas to a lesser charge; and

18   (v) the number of trials (broken down by bench vs. jury trials) conducted and the outcome of the

19   trials.

20        12.  Conducting a quarterly analysis of whether the Cities' public defense system

21   (i) provides actual representation of and assistance to individual criminal defendants, including

22   reasonable investigation and advocacy and, where appropriate, the adversarial testing of the

23   prosecutor's case and (ii) complies with all provisions of the public defense contract and all

24   applicable provisions of the Cities' ordinances and regulations.  The Public Defense Supervisor

25   shall meet with the officials charged with administering the public defense contract to advise

26   how the Cities' performance can be improved based on the quarterly analysis.

MEMORANDUM OF DECISION              -21-

13. Submission of biannual reports to the parties explaining: (i) whether all of the duties specified above have been performed in the most recent six-month period, and if not, why not, including a specific discussion of each duty that has not been performed and the Public Defense Supervisor's recommendations for how to achieve compliance; (ii) whether the Cities' public defense system (a) provides actual representation of and assistance to individual criminal defendants, including reasonable investigation and advocacy and, where appropriate, the adversarial testing of the prosecutor's case and (b) complies with all provisions of the public defense contract and all applicable provisions of the Cities' ordinances and regulations, and if not, why not, including a specific discussion of each item where the Cities fall short and the Public Defense Supervisor's recommendations for how to achieve compliance. The Public Defense Supervisor shall submit his or her first report to the parties six months after the date of this Order. The Public Defense Supervisor shall continue to submit a report every six months thereafter for a period of 24 months or until the Court orders otherwise.

– Twelve months, 24 months, and 34 months after the entry of this Order, the Cities shall provide fifty case files, randomly selected by the Public Defense Supervisor, to plaintiffs' counsel so that they may evaluate the Cities' compliance with this Order and whether the Public Defense Supervisor is properly performing his or her duties. This Court shall retain jurisdiction over this case for three years from the date of entry of this Order, and this injunction shall remain in effect for that period. However, if the Public Defense Supervisor's annual reports show prior to that date that the system provides indigent criminal defendants actual representation by and assistance of counsel, such that defendants have the opportunity to assert any rights or defenses that may be available to them and appropriate adversarial testing occurs, defendants may petition the Court to dismiss the case and terminate the injunction at that point in time.

– If plaintiffs believe that the Cities' efforts to provide an adequate system of public defense are not trending in the right direction or a dispute arises as to compliance with the

1  injunctive provisions of this Order, plaintiffs' counsel shall notify defendants in writing of any

2  objections they have regarding the Cities' efforts or compliance.  Within fourteen days of receipt

3  of the objections, the parties shall meet and confer to discuss and attempt to resolve the dispute.

4  If the parties are not able to resolve the objections, plaintiffs may file a motion seeking

5  appropriate relief.  The motion shall be noted for consideration on the third Friday after filing,

6  the motion and opposition pages shall not exceed 24 pages, and the reply shall not exceed twelve

7  pages.

8  **CONCLUSION**

9      It has been fifty years since the United States Supreme Court first recognized that

10  the accused has a right to the assistance of counsel for his defense in all criminal prosecutions

11  and that the state courts must appoint counsel for indigent defendants who cannot afford to retain

12  their own lawyer.  The notes of freedom and liberty that emerged from Gideon's trumpet a half a

13  century ago cannot survive if that trumpet is muted and dented by harsh fiscal measures that

14  reduce the promise to a hollow shell of a hallowed right.

15

16      Dated this 4th day of December, 2013.

17

18      Robert S. Lasnik
        United States District Judge

19

20

21

22

23

24

25

26

MEMORANDUM OF DECISION                    -23-