# Exhibit A

# **Public Defense Supervisor's**

# **Third Biannual Report**

Eileen Farley
WSBA No. 9264

TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

REPORT ............................................................................................................... 2

I.   Issues Identified in My First and Second Reports Which Have Not Been Resolved or Are in Process. ................................................................................................ 2

    A.  Contract Provisions for Conflict Counsel. ................................................ 2

    B.  Continued Restrictions on Access to Counsel. .......................................... 5

        1.  Screening Process. ............................................................................ 5

        2.  Barriers to Obtaining Counsel in "Change of Venue" Cases. ............... 6

        3.  Confidential Meeting Spaces. ............................................................ 8

    C.  Improved Access to Counsel. ................................................................... 8

    D.  Public Defense Contract Administrator. .................................................... 9

    E.  Training. ................................................................................................. 10

    F.  Refund of Overpayment of Cost of Appointed Counsel. ........................... 12

    G.  Miscellaneous Issues. ............................................................................. 13

        1.  Court Recordings. ........................................................................... 13

        2.  Language Access Plan ("LAP"). ..................................................... 13

        3.  Copies of Court Orders for Case Files. ............................................. 15

II.  Review of Sixty Public Defense Client Files and Case Summaries. ..................... 15

    A.  Client Related Information Filed Under Seal. .......................................... 15

    B.  Information Reviewed. ............................................................................ 16

    C.  Information Available to the Cities for Assessing Its Public Defense Services. ........ 19

        1.  Using Reports to Assess the Quality of the Cities' Public Defense System. ...... 19

        2.  Specific Information Now Reported and Which Should Continue to Be Reported. ................................................................................. 20

III. Complaints and Complaint Process. ................................................................... 23

    A.  Process Now in Place. ............................................................................. 23

    B.  Complaints and Comments Received to Date. .......................................... 23

IV.  Future Steps and Other Issues. .......................................................................... 24

Eileen Farley, the Court-Designated Supervisor, submits this Third Biannual Report pursuant to the Court's December 4, 2013, Memorandum Decision (ECF 325) and February 24, 2014, Order and Stipulation Regarding Selection of Public Defense Supervisor (ECF 353).

## **INTRODUCTION**

Since my Second Report, submitted in April 2015 (ECF 364), I have continued to stay in Skagit County an average of two nights one week and three nights a second week each month, travelled to Mt. Vernon and Burlington ("the Cities") for meetings on many other occasions, and consulted with Mountain Law by phone or email, as well as in person.  During my visits I have observed Mountain Law attorneys in court and met with each of them separately.  I have continued to meet with the City managers and other City officials and with others involved in the criminal justice system.

I have also reviewed 60 randomly-selected cases for compliance with the Court's December 4, 2013, Memorandum of Decision.  ECF 325 at 21-22.  The information from my review of the file notes, discovery and any other information contained in the files is compiled in a spreadsheet (Exhibit 5), which I am filing separately under seal because it identifies clients and includes information taken from their case files.  Before reviewing the cases I advised Mountain Law Managing Attorney Michael Laws of the information I would compile, discussed my initial findings with him after reviewing approximately a dozen cases, and provided him with a copy of the completed spreadsheet.

In addition to the file reviews, I have observed Mountain Law attorneys during jury trials, obtained and reviewed transcripts of the trials, which I provided to Mr. Laws and the trial attorneys, and reviewed the transcripts with the attorneys.

My goals continue to include:  (1) providing the Cities with tools to assess the qualifications required for a law firm providing public defense services; (2) suggesting appropriate contract terms for the provision of public defense services, including contracts with counsel who are assigned conflict cases; (3) assisting in the Cities' work to build a process for

evaluating and monitoring the quality of public defense services and for compliance with (a) the terms outlined in the Court's Memorandum of Decision, (b) the Standards for Indigent Defense, effective October 1, 2012, and (c) Standard 3.4, Section 3 Caseload Limits, effective January 1, 2015, and (4) informing the Court of the Cities' response to, and progress made, with respect to the issues identified in my First and Second Reports.

**REPORT**

**I.**     **Issues Identified in My First and Second Reports Which Have Not Been Resolved or Are in Process.**

The following discussion, which focuses on issues identified in my First and Second Reports that remain unresolved, should not overshadow the positive steps taken by the Cities and Mountain Law to build a strong public defense system.  Several unresolved issues are being addressed.  In one instance the Cities have improved the access to counsel and should be commended.

The three primary issues that remain unresolved are:  (a) the recruitment and negotiation of agreements between the Cities and attorneys on the "conflict panel"—that is, attorneys who have agreed to provide representation when Mountain Law has a conflict of interest; (b) the continued restriction of access to counsel caused by the screening process; and (c) the process of creating and building into the Cities' administrative structure a well-qualified person responsible for overseeing public defense contract compliance, without which the Cities risk erosion of the progress they have achieved to date and are expected to achieve while I am Supervisor.

    *A.*     *Contract Provisions for Conflict Counsel.*

The Court's Memorandum of Decision required the Cities to "re-evaluate their existing contract for the provision of public defense in light of the Court's findings."  ECF 325 at 18:17. The Cities and Mountain Law re-negotiated their contracts as described in my Second Report.  In September 2015, the Cities retained outside counsel to draft a proposed Contract for Legal Services to be negotiated with attorneys on their conflict panel.

Between January 2015 and September 30, 2015, Mountain Law was unable to represent clients because of a conflict in approximately 70 cases. These cases have been re-assigned to the three attorneys on the Cities' "conflict panel" who have agreed to represent clients when Mountain Law cannot. During June and July 2015, I met with each of the attorneys on the conflict panel to discuss what information the Cities will ask them to report in future. After discussion, the Cities agreed to reimburse each conflict panel attorney for the estimated four hours a month in staff time needed to compile the information they wish conflict counsel to report.

While the Cities now have begun revising their contracts with the three attorneys on the conflict panel, the larger problem is the scarcity of attorneys willing to accept these cases. In March 2015, the Cities issued a Request for Qualifications ("RFQ") in an effort to broaden the pool of attorneys willing to accept conflict cases. (*See* RFQ, Exhibit 1 to this Report.) The RFQ was posted in the Skagit Valley Herald, included on the Skagit Bar Association webpage, and emailed to members of the Skagit County Bar Association.

The response was minimal. One attorney, who was already accepting conflict cases, applied to be on the panel. A second attorney continued to accept conflict cases, though he has not formally applied. A third attorney applied later and is now being assigned cases. In subsequent discussions with local attorneys, the Cities learned that the rate of $55 per hour that they were paying conflict attorneys was less than the $65 per hour paid by Skagit County for similar work. The Cities agreed to raise their rate to $65 per hour. (This rate may still be too low to attract additional qualified conflict attorneys.)

The three present conflict attorneys identified issues that make representing defendants in the Cities difficult.

Defendants who fail to appear at a hearing, for whom the court has issued arrest warrants, may ask the court to quash the warrant and give them a new court date, often without notifying their attorneys. According to the conflict attorneys, if this occurs the Skagit County District Court scans and emails them their clients' new court dates, but the City courts mail them a hard

-3-

copy of the notices.  Mountain Law couriers notice of the new court dates to the conflict attorneys if its office receives them.  However, according to one of the conflict attorneys:

> …depending upon the date of the quash I sometimes receive the notice after the next hearing date because the period of time between the quash and the next hearing date is too short.  I have had to scramble for coverage at times.  I would suggest that the materials be scanned and e-mailed same day by both entities.  District Court has done a great job of sending documents that way…

October 8, 2015, email from conflict panel attorney.

One conflict attorney identified a second issue:  If an out-of-custody client facing a court date some weeks in the future is taken into custody on a different charge, the City court often will advance the client's out-of-custody hearing date to the next City in-custody hearing date without notice to the attorney.  Thus, conflict attorneys must routinely review the jail calendars—which are sent electronically the day before the jail hearing—to see if any of their clients are on the list.  Absent this review, counsel learns of the new date only if the client is able to call counsel from jail, which sometimes does not happen.  Mr. Laws confirmed that his office has had similar experiences, but since the public defenders are always in court it has been less of a problem.

Given (1) the low response to the Cities' RFQ, (2) the fact that two of the three conflict counsel had to temporarily stop taking new cases due to high caseloads; and (3) concern that as the end of the year approaches conflict attorneys may reach their annual caseload maximum, which includes not just the conflict cases but all other cases handled by the attorney, the Cities should work to broaden their conflict panel, paying an hourly rate sufficient to attract qualified applicants, work with the City courts to determine what support they need in order to give conflict counsel notice of new court dates, and complete the re-drafting of contracts with conflict attorneys.  As noted in my Second Report, with administrative assistance provided by the Cities, conflict attorneys should be required to comply with caseload standards, to report the same case-related information required from Mountain Law, and to meet the same CLE standards required of Mountain Law.

The Cities should explore broadening the area in which it circulates the request for conflict counsel, perhaps to Whatcom and Snohomish Counties, and paying an amount toward travel costs as one method of broadening the pool of possible conflict attorneys in addition to reviewing its compensation amounts.  In my next report I will confirm that the initial RFQ was sent to all members of the Skagit County Bar Association.

       B.       *Continued Restrictions on Access to Counsel*.

          1.       <u>Screening Process</u>.

After my Second Report, the Cities understood that their municipal courts would appoint counsel for defendants facing City charges who were held in custody, regardless of whether they were held on such City charges or on charges from other jurisdictions.  In a few cases, the Cities' municipal courts continued to refer for screening clients not held on City charges, but held on charges from other jurisdictions, even though the Cities do not have a jail screener.  When I raised this with the Cities, they agreed that Mountain Law should enter a notice of appearance for clients held in custody, whether held on City charges or on charges from another jurisdiction, as is permitted under RCW 10.101.  This solution seems to have resolved the issue.

In July 2015, the Cities and a local nonprofit service provider, Community Action, entered into a contract under which Community Action was expected to screen out of custody defendants at its Mount Vernon office during regular business hours.  Community Action screening was expected to be in addition to the screening conducted at the courthouses on court days after defendants made their first appearances.  In anticipation of this plan, staff from Community Action, the Mount Vernon and Burlington courthouse screener, and I, attended a June 5, 2015, training on screening practices offered by the Washington State Office of Public Defense.

However, despite the Cities' agreement with Community Action most out-of-custody defendants continue to be able to request a public defender on only three days a month in Burlington, and four days a month in Mount Vernon.  After the agreement between the Cities

and Community Action was signed, Community Action became concerned about, among other things, a possible conflict between its new screening duties and its existing Volunteer Attorney program, which assists petitioners with applications for restraining orders.  To date, the enhanced screening access has not been publicized and Community Action has screened only a handful of defendants, most of whom had come to the Mountain Law office asking how they could obtain counsel.

The Cities must broaden the opportunities for defendants to obtain public defense counsel beyond the few days a month now available.

The Cities have now proposed hiring a half-time public defense contract administrator who will also screen defendants.  This position is further discussed below.

2.     Barriers to Obtaining Counsel in "Change of Venue" Cases.

During my file reviews I noticed that some cases had originally been filed in Skagit County District Court and then, on the State's motion for "change of venue," moved to one of the Cities' municipal courts.  This seemed to occur most often when City police officers asked a Washington State Trooper to assist with a DUI arrest, and the trooper then filed the case directly in Skagit County District Court.  Mountain Law estimates there are three to five "change of venue" cases a month, though cautioned the estimate was not based on a file review, and I have concerns regarding the rights of defendants in these cases.

Municipal courts have exclusive original jurisdiction of charges brought under municipal ordinances.  RCW 3.50.020.  Whether any case filed in District Court has been "transferred" to a municipal court, or has effectively been dismissed and refiled is beyond the scope of this Report.  However, filing a case in District Court and then prosecuting it in municipal court delays defendants' meaningful access to counsel.  Defendants in the District Court are represented by the Skagit County Public Defenders' Office, and when a case leaves the District Court, such representation ends.

At present, counsel will not be appointed in the Cities' municipal courts until a defendant has his or her next court appearance.  Defendants must wait for one of the three days a month in Burlington, or four days a month in Mount Vernon, to ask that counsel be appointed.  Again, the defendant cannot ask for counsel in advance of the hearing but must go into court, ask the judge that an attorney be appointed, be referred to the screener outside and given another date to return to court.  Defendants in these "change of venue" cases must appear twice in court before being assigned an attorney who will represent them.

On at least one occasion after a "change of venue" procedure the district court docket reflected that the State's "change of venue" motion had been agreed to by the defendant and his attorney from the office of the Skagit County Public Defender.  The Mountain Law attorney representing the defendant objected in the municipal court that the procedure followed was more properly a dismissal and refiling of the charge, with speedy trial implications.  The City, relying on the docket, replied that the defendant had agreed to the procedure and waived any objection, and the court agreed.

After the hearing, defense counsel contacted the county public defender, who said she had objected to the motion.  Mr. Laws reviewed the record of proceedings, which showed defense counsel had objected in the District Court to the State's motion.  The District Court clerk said the docket would be corrected, but the process of starting a case in one court and finishing it in another, in addition to creating a hardship for defendants and delaying access to the attorneys who will ultimately represent them, creates opportunities for errors such as this.

The Cities have said that defendants held in custody in the "change of venue" cases will be assigned a City public defender promptly at the court appearance the day after they are booked into jail.  For defendants who are out of custody, the Cities should find a way in which to avoid any delay in meaningful access to counsel caused by this process.

This issue and the limited screening opportunities currently provided by the Cities may be partially resolved by the proposed half-time position of Public Defense Contract

Administrator, which will be voted on by the Burlington City Council on November 12, 2015, because that position will also screen defendants for appointment of counsel.

   3. <u>Confidential Meeting Spaces</u>.

  In my First and Second Reports, I discussed the importance of creating confidential meeting spaces at the courthouses to permit Mountain Law and conflict attorneys and their clients to hold brief, but necessary, confidential discussions.  (Second Biannual Report, I.F, pp. 7-8., ECF 364.)  Mountain Law reports that the desks arranged in the back of the Burlington Municipal Court provide sufficient confidential space in which to meet with clients.  The City of Mount Vernon was unable to make such an arrangement because of objections from the court. (*See id.*)  At the time of my Second Report the City of Mount Vernon Facilities Director advised me that the City was contemplating "remodel" to provide confidential meeting spaces near the courtroom.  The City of Mount Vernon now plans, since the court objected to the use of "cubicles" or moveable walls in the back of the courtroom, to build a small room for short, confidential communications with counsel.  This plan should be implemented promptly.  I will report its status in my Fourth Report.

   C. *Improved Access to Counsel.*

  As noted in my First Report, the Skagit County Jail has been significantly over-capacity for a number of years.  Funding for a new jail has been approved by county voters and planning is underway.  In the meantime, the Jail has taken steps to reduce crowding, one of which is to send inmates sentenced to the Washington State Department of Corrections ("DOC") to the DOC intake point at Shelton almost immediately after sentencing.

  Many of these defendants also have cases in the City courts.  In my file reviews I often see references to communications between Mountain Law and the Skagit County Public Defender's Office about clients they have in common.  When given notice, Mountain Law scrambles to have a client's City case resolved in the few days before he or she is transferred to DOC custody.  Where this is not possible, the City courts issue arrest warrants for defendants

who have been transferred to DOC custody when they fail to appear at their next hearing. Mountain Law often receives requests from inmates held by DOC for assistance with their City warrants.

Outstanding City warrants apparently disqualify prisoners from lower custody options such as firefighting crews and certain work programs, and in one case, from a federal drug treatment program. The Cities have agreed to appoint Mountain Law to assist with the warrants while the defendants are held at DOC and not to insist that the defendants return to Skagit County before being appointed counsel. This is a practical and humane solution, particularly since most of those defendants will be returning to Skagit County and will benefit from programs and custody conditions for which they might otherwise be disqualified by warrants. I will confirm in my next report that this expected practice has been implemented.

D.     *Public Defense Contract Administrator.*

In my First and Second Reports, and again during my meetings with the Cities, I have stressed that for any meaningful reform to last, the Cities must identify and incorporate into their governing structure a qualified individual who will be responsible for monitoring their public defense system.

Mountain Law has developed and continues to refine the information it reports to the Cities. The information is useless, however, if the Cities do not review and understand it. Similarly, if no one monitors the components of the Cities' criminal justice system, certain components may be nonfunctional, or function poorly. (*See, e.g.,* discussion of the Burlington Municipal Court recordings in section *G. 1.*) The administrator must be assigned the responsibility for monitoring the system and have the authority (or direct reporting authority) to see that issues are addressed and resolved.

After discussion in which I participated, the Cities have proposed creating such a position, to be housed in the City of Burlington, but responsible for public defense in both Cities. The Cities will share responsibility for a contract administrator, initially half-time, who will also

screen defendants who ask for a public defender.  (*See* Public Defense Contract Administrator job description attached as Exhibit 2 to this Report.)  The Administrator will be responsible for: screening; obtaining, reviewing, and, if necessary, asking for refinements of reports required of public defense providers, including conflicts counsel; reviewing all contractually-required reporting items such as Certificates of Compliance with caseload and other practice standards and guidelines; monitoring the Cities' web pages for public defense information; and other duties as necessary to oversee and improve the Cities' public defense system.

The position was sent to the Burlington City Council on November 2, 2015, and submitted for vote on November 12, 2015.  Funding for the position was included in the Mayor's budget, which is to be submitted for vote on November 24, 2015.

The Cities should work with their respective city councils to develop this position and its necessary funding.  The Cities should continue discussions about how to insulate this position from undue political interference.

     E.     *Training*.

In my previous Reports I identified the need for a robust training program given the relative inexperience of the attorneys and the turnover of attorneys and staff, which is likely to continue.  Since my Second Report, another Mountain Law attorney and another staff member have left the office.  The most senior attorney in the office, other than Managing Attorney Michael Laws, was admitted to the bar in October 2012, and the other three attorneys were admitted in 2013, 2014 and 2015.  (The attorney admitted in 2013 clerked and only began practicing in 2015.)

Mountain Law attorneys and staff have spoken of the collegial nature of their office, which corresponds with my observations when I visit the office.  The turnover is consistent with rotations from misdemeanors into other units that one would find in a larger office with multiple practice areas and will continue to be an issue Mountain Law must address.

Mr. Laws is updating the training manual he developed in 2014.  He is exploring the use of video, possibly with actors as clients, as a way to give attorneys feedback about how they interview clients.  I will confirm in my next Report that the manual has been updated.

In April 2015 all attorneys in the office, except the most recent hire, attended the Washington Defender Association annual two-day conference.

In August 2015, Jodi Backlund and Manek Mistry, whose practice focuses on appeals, presented a training on how to preserve issues for appeal, particularly those that arise during closing argument.  (Ms. Backlund and Mr. Mistry most recently argued successfully for reversal of their client's homicide conviction in *State v. Walker*, 182 Wn.2d 463, 341 P.3d 976 (2015).) Conflict counsel and public defenders from the Skagit County Public Defender's Office were invited and several attended this training.

In September 2015, Mountain Law attorneys met with Scott Wenzl, who directs the Community Work Program for the City of Mount Vernon.

In October 2015, Mr. Laws invited the Mountain Law attorneys to an informational meeting with Tierra Nueva, a local nonprofit that works with inmates and gang members.

In November 2015, at least one Mountain Law attorney will attend a training offered by the Washington State Office of Public Defense focused on Legal Financial Obligations and the recent Washington Supreme Court decision in *State v Blazina*, 182 Wn.2d 827 (2015).

In December 2015, Martha Cohen, the Program Manager for the Office of Interpreter Services for King County Superior Court, will provide to Mountain Law attorneys and staff an interactive training on how to best work with interpreters.  (The Office of Interpreter Services was recognized in a 2006 report by the National Institute of Justice as one of three model programs in the country.)

In December 2015, all Mountain Law attorneys, other than Managing Attorney Laws, will attend "DUI Trials from Beginning to End," sponsored by the Washington Foundation for Criminal Justice.  I commend Mountain Law on its training efforts.

In my Second Report, I stated that Mountain Law should identify opportunities for attorneys to learn about mental illness, from which many of their clients suffer. The National Alliance for the Mentally Ill and Disability Rights Washington is offering a training on the mentally ill in the criminal justice system. I recommend Mountain Law attorneys attend this and/or other trainings related to mental illness.

The Cities should, as provided in the current contract with Mountain Law, require the firm to confirm that attorneys have reviewed the training manual and earned ten CLE credits in an area relevant to misdemeanor public defense.

The Cities should also, in the revised contracts with attorneys on the conflict panel, require those attorneys to report their CLE credits to the City Administrators, at least until the public defense Administrator is in place and has been trained and assigned this responsibility.

F.    *Refund of Overpayment of Cost of Appointed Counsel.*

In my First Report I noted that during the period from 2008-2012, some defendants paid the Cities for their public defenders more than the Cities had paid the previous public defense providers to represent them.

The Cities have now reviewed the payment records and devoted significant effort, with the assistance of the courts, to finding current addresses for defendants who overpaid. In October, the Cities sent notices in English and Spanish to approximately 220 defendants. The Cities also published notices of overpayment in the Skagit Valley Herald and posted them in the municipal court lobbies, the post office, and the library. Mountain Law posted the information in its office, at the Cities' request. Mount Vernon has refunded overpayment to 35 of the 122 defendants it identified. The City will send a second notice to defendants in mid-December. All unclaimed funds will be deposited with the Washington State Department of Revenue Unclaimed Property Department. The City of Burlington received 25 requests for repayment within the first week after the notices were sent. At the end of this year, it also will deposit any unclaimed funds

with the Washington State Department of Revenue.  I will confirm the status of this effort in my next Report.  The Cities are to be commended for their resolution of this issue.

       G.     *Miscellaneous Issues*.

          1.    Court Recordings.

In summer 2015, the Burlington City Information Technology ("IT") department upgraded the computers used by the municipal court.  This created problems with the recording system which the court did not discover until I requested the record of a hearing and the transcriptionist said the quality was too poor to transcribe.  I advised the Court Clerk and the City Manager of the problem and recommended the City reach out to the court, and if the court asked for assistance, the City should provide it.  After being notified of the problem, Burlington Municipal Court Judge Svaren responded that I had brought this problem to the court's attention approximately three weeks after the computer change out and it was remedied in a day.  Judge Svaren stated:

> While I do not expect this problem to repeat itself (unless the computer gets swapped out again) I have asked the court administrator to independently verify the quality of the recordings after each court session after she has loaded the saved recordings to the City of Burlington's web site.

State law requires the Cities to provide "a suitable place for holding court and . . . costs of maintaining it."  RCW 3.50.080.  Although courts are traditionally responsible for the maintenance of their own records, the duties of the Public Defense Contract Administrator should include regular review of the municipal court recording system or an agreement with the court that the court will regularly review the accuracy of the recordings and request assistance from the Cities' IT Department as needed.  Until the Contract Administrator is in place the Cities should verify with their courts that the recording systems are functioning properly.

          2.    Language Access Plan ("LAP").

RCW 2.43.090 requires courts to adopt a Language Access Plan ("LAP").  The 2007 *Skagit County Superior/District/Municipal Court Language Assistance Plan (LAP)* provides that

it shall be posted on the websites of the superior, district and municipal courts and be updated annually.  As noted in my Second Report, the LAP is not posted on the website for either City court, and does not seem to have been updated.  The Cities have arranged for the display in their courthouses of the poster provided by the Administrative Office of the Courts, which explains in multiple languages the right to interpreter services.  Since my Second Report, the City of Burlington has provided a phone with access to a "language line" on the wall outside the office of the Municipal Court Clerk.  The Mount Vernon Municipal Court continues to have at least one clerk who speaks Spanish.

The Interpreter Commission, established in 1987 by General Rule (GR) 11, which is chaired by Justice Steven Gonzalez, is revising the template for suggested LAPs and hopes to have the revised LAP completed by early 2016.  When the Interpreter Commission template is available I will provide it to the Cities and to the municipal courts.

I have already provided as a resource for the Cities a copy of the LAP adopted by the City of Mattawa, Washington, and incorporated into its 2008 Memorandum of Agreement ("MOA") with the United States Department of Justice ("DOJ").  While the Mattawa LAP addresses interpreter services in the Mattawa Police Department, it is a useful template for the Cities to assess their obligations to provide interpreter services, since the municipal courts have not updated or posted their LAPs.

The Cities should obtain for the respective Municipal Court Clerk's offices language "cards," which can be obtained, at no cost, from the Washington State Administrative Office of the Courts.  The cards state "I speak [named language]" in English and the named language. Persons who speak another language can point to his or her language on the appropriate card. This helps the clerks identify the appropriate language for which an interpreter is needed.

The Cities and the courts should discuss what must be done to meet their obligations under RCW 2.43.090 and do what is required to meet such obligations.

3.       <u>Copies of Court Orders for Case Files</u>.

Copies of the final Judgment and Sentence orders used by the municipal courts are provided to the defendant, with a copy retained in the court file.  Copies are not given to defense counsel at the time of sentencing.

Based upon my review of Mountain Law files, in some cases the courts scanned and sent a copies of the final Judgment and Sentence to the public defender but this does not appear to have occurred in most cases.  After discussion, the Cities agreed to pay for the cost of a scanner to be purchased by Mountain Law and used to make copies of the Judgment and Sentence for the attorneys' client files.  Mountain Law has purchased the scanner and it should be in use by the end of October 2015.

The Cities should provide a scanner or other copying resource, unless the courts provide defense counsel with a copy of their final orders.  Mountain Law should include a copy of the Judgment and Sentence, or Order of Dismissal, in each client file.  I will confirm that this practice is in place in my next Report.

**II.   <u>Review of Sixty Public Defense Client Files and Case Summaries</u>.**

A.       *<u>Client Related Information Filed Under Seal</u>.*

The Court's December 4, 2013, Memorandum of Decision outlined my duties as Supervisor, including "evaluation of whether public defenders are responding appropriately to information provided by the client and discovery obtained in each case, including pursuing additional discussions with the client, investigations, medical evaluations, legal research, motions, etc., as suggested by the circumstances."  ECF 325:20.

To protect the client information that I would need to see to perform this, among other duties, I sought a Protective Order to delineate how that information would be protected when I filed my Reports to the Court.  The April 14, 2014, unopposed Protective Order entered by the Court provided that information would be marked "CONFIDENTIAL" and filed under seal if (1) general statistical data was so specific it would identify a particular client or (2) if disclosure

-15-

of the information to the Court is necessary in order to perform my duties.  In all cases the disclosure shall not be greater than necessary to perform my duties.  ECF 356 at 3-4.

The summaries filed herewith under seal as Exhibit 4 are necessary to describe how Mountain Law attorneys are approaching their cases.  The appropriateness of Mountain Law's and the attorneys' representation depends in large part on the facts specific to each case which would identify the clients.

The information contained in the spread sheet filed herewith under seal as Exhibit 5 identifies the clients and cases I reviewed, as well as whether the file reflects that the attorney consulted with an immigration attorney and/or discussed mental health treatment options with the client, as appropriate.

In addition, the Memorandum of Decision also calls for broad ranging and full discussions with the public defenders about clients and detailed statistical data about cases.  In order to maintain client confidences and confidentiality, I am filing under seal the summaries of representative discussions with the public defenders, the specific case-related information contained in the spread sheet, issues for future discussion I identified after reviewing files, and the substance of the client complaints I received.

As provided in the Protective Order, the disclosure here, even for those items filed under seal, is no greater than necessary to provide the Court with the information called for in its December 4, 2013, Memorandum.

B.    _Information Reviewed_.

The Court's Memorandum of Decision directs the Supervisor to review fifteen files per attorney per quarter.  (This is in addition to the review of fifty files to be reviewed every six months.)  The review should evaluate whether public defenders are making contact with clients within 72 hours of appointment (or documenting why they could not make that contact), and whether an opportunity for confidential communications occurred prior to the next court hearing after appointment.  In addition the Supervisor "will also take steps to ensure that the public

-16-

defenders perform [certain] tasks when they first meet with a client following a new case assignment." ECF 325:19.

Mountain Law has provided me with read-only access to all cases stored in its electronic case management system ("CMS"). Before I began my file reviews, I discussed with Mr. Laws the information I would gather. Mr. Laws, using the random method of selection described in my Second Report, provided me with a list of 15 cases assigned to each attorney in the office between January and June 2015. I discussed my initial observations with Mr. Laws after reviewing a total of 10-15 cases. After I completed my review, I discussed my conclusions, reviewed the spreadsheet of my observations (filed herewith under seal) with him and provided him with a copy.

In total, I reviewed 60 cases. I read all file notes and all discovery, and I listened to all voice mails stored in the files. (In my separate review of the 50 cases discussed in my Second Report I also reviewed all of the court dockets.) In my reviews, I looked to see if the file showed: a conflict check; that the names of witnesses/co-defendants were entered into the case management system (important for future conflict checks); whether the defendant was in-custody; whether there had been contact within 72 hours of appointment; whether the defendant had been advised of his or her rights; whether a review of discovery indicated that the defendant suffered from a mental illness, and, if so, whether there was any discussion of treatment options; whether the file reflected concerns about the client's literacy or ability to speak English; whether there was an investigation, and if so, the time spent and effort undertaken by the investigator; whether there was consideration of and/or consultation with a possible expert; whether there was legal research, and the total attorney time spent on the case.

I also noted specifics of some cases, for example, whether a plea was part of a global resolution, whether the client failed to appear (FTA'd) or was on bench warrant, whether there was a Judgment and Sentence in the file, and whether the client was initially represented by the Cities' former public defense provider.

-17-

My observations, set forth in the case summaries and spreadsheet filed herewith under seal, are drawn from the information I obtained during my detailed review.

Mountain Law's strength continues to be in the effort it makes to communicate with its clients.  As noted in my First Report, Mountain Law staff attend court and meet with clients to schedule an appointment with the attorney immediately after the office is appointed.  Clients leave the courthouse with a written appointment notice, a sheet with directions to the Mountain Law office, and a Comment form telling them how they may contact me—all in a file with the Mountain Law logo and address on the outside.

The files I reviewed showed that Mountain Law staff routinely call clients to remind them of appointments.  File notes reflected notes from client meetings, including often several out-of-court meetings over the course of the representation.  Attorneys are also appropriately requesting assistance with investigation of cases.

Mr. Laws developed a "checklist" embedded in the Mountain Law case management system that attorneys are to review when meeting with clients to remind them of the issues to be covered during the client meeting.  It is not clear that all the attorneys are routinely using the checklist, and I relied in my review on the written file notes to determine if the attorney discussed the client's rights and had obtained authority to make a decision about whether or not to accept a plea offer from the City.

After I had reviewed 10-15 cases, I told Mr. Laws that I was not seeing contact with clients within 72 hours of appointment, as required by the Court's Memorandum of Decision. Mr. Laws revised the office procedure and now reviews the file of each client assigned to each attorney that week.  If the file does not reflect that the attorney has timely contacted the client, he sends the attorney a reminder email.  Mr. Laws said this procedure is helpful not only to remind attorneys of the 72-hour requirement, but also gives him an opportunity to review the early file notes to see what has been done, or not, in a case.  This procedure should ensure compliance with the Court's order.  This is an issue I will monitor and report on in my next Report.

-18-

Based on my file review, my primary concern is in the area of legal research.  Mountain Law provides access to Westlaw, has a copy of the Caselaw Notebook prepared by Judge Ronald Kessler in its shared electronic "library" and, as noted above, is sending attorneys to a variety of appropriate trainings.  Nevertheless, the files reflected infrequent use of available research tools. This may in part be an issue of documentation, rather than an issue in practice; in any case it requires considerable improvement.  In the sealed portion of this Report I discuss the specifics of problematic cases.  I will monitor this issue, discuss any concerns with Mountain Law and report on it in my next Report.

The number of cases required for these overlapping file reviews restricts the time available to meet with attorneys and discuss their cases.  I therefore request the Court to reduce the number of cases to be reviewed in detail for the quarterly reviews to eight per attorney, and the number of cases to be reviewed every six months to a total of 30 cases.

        C.      *Information Available to the Cities for Assessing Its Public Defense Services.*

           1.      Using Reports to Assess the Quality of the Cities' Public Defense System.

The Court's Memorandum of Decision gives me access to client files and reports developed by Mountain Law.  The reports, if scrubbed of client identifiers, can be one of the tools used by the Cities to assess the quality of its public defense providers.

Each case file, in addition to copies of pleadings and the file notes, contains a record of the time and tasks attorneys and staff spent working on the case.  The file also, when the case is closed, includes the disposition of the case and certain discrete events, such as whether or not there was a trial.  Drawing on that information, Mountain Law now advises the Cities as to how many cases an attorney has been assigned each month, the charges, and confirms that the attorney has not been assigned to more cases than permitted under the caseload standards adopted by the Washington Supreme Court.  The case management system ("CMS") reports can also, for example, show the Cities how many times an attorney visited clients in jail during the preceding month, the results in completed cases, and how many hours were spent supervising

attorneys and on investigation.  That information, scrubbed of client identifiers, in combination with observations of attorneys in court, client surveys, and a clear and easy "Complaint/Comment" process can give the Cities a good sense of how their public defense system is performing—provided the reports and other information are reviewed by someone who understands them and has the authority to act promptly upon them.

        2.      <u>Specific Information Now Reported and Which Should Continue to Be Reported</u>.

Mountain Law now sends monthly reports sent to the Cities which include:

- Cases assigned to the office, charge type, attorney representing each client, and number of cases assigned to the attorney year-to-date;

- Closed cases and their dispositions—for example, whether a case was dismissed, dismissed pursuant to a plea bargain, resulted in a plea to a lesser, plea as charged, and whether probation was closed, maintained, or revoked;

- Cases from which the office withdrew before completion and whether they were sent to conflict attorneys;

- Inmate contact, including date and time of jail visits, and phone calls to and from the jail;

- Trials and their results.  (If a case was dismissed after it was confirmed for trial, the report includes that information; if the case was continued, the report notes the reason);

- Charges by type and percentage of each charge type overall; and

- Investigator time, administrative time, and time spent on legal research and brief writing.

Within the office, Mountain Law attorneys and staff record their time by discrete tasks, rather than a single note of "Attorney Time" or "Investigator Time."  The list of tasks for Attorneys and Investigators includes:

- Client Meetings;

- Witness Interviews;

- Phone calls;

- Case Preparation and Review;

- In-court observations; and

- Travel.

Administrative Time includes:

- Supervision Time;
- Meetings;
- Data Maintenance; and
- Producing Reports.

Mountain Law also provides some general information about the Cities' criminal justice systems. For example, the report below reflects the distribution of charges in both Cities by charge type.  The report includes at the top, though I have deleted their names here, the distribution of those charges among the attorneys in the office.  This lets the Cities see not just the number of cases an attorney has been assigned year-to-date, but how the workload is distributed.

The Report also lets the Cities see that Driving with License Suspended in the Third Degree (DWLS 3), a low-level offense often related to unpaid tickets, is about five percent of the public defense workload.  This information should be useful to the Cities in assessing whether a relicensing or similar program could free tax dollars, permitting increased focus on offenses of greater risk to community safety, such as domestic violence or Driving Under the Influence ("DUI").

The Public Defense Contract Administrator must be able, among other things, to understand the reports and, if needed, work with the public defense provider to develop other reports needed to give the Cities the information they need to assess their public defense system.

| | | | | | | |
|---|---|---|---|---|---|---|
| **10.3%** | DV ASSAULT | 20.8% | 10.2% | 7.2% | 14.1% | 5.3% |
| | MVM | 17 | 19 | 8 | 18 | 5 |
| | BUR | 4 | 2 | 8 | 8 | 6 |
| **1.5%** | ASSAULT 4 | 2.0% | 1.5% | 0.5% | 1.1% | 2.9% |
| | MVM | 1 | 2 | 1 | 1 | 4 |
| | BUR | 1 | 1 | 0 | 1 | 2 |
| **4.2%** | DUI | 6.9% | 4.4% | 4.1% | 3.8% | 3.4% |
| | MVM | 5 | 5 | 4 | 7 | 4 |
| | BUR | 2 | 4 | 5 | 0 | 3 |
| **3.5%** | VNCO / VPO | 3.0% | 5.4% | 2.3% | 3.8% | 2.9% |
| | MVM | 1 | 10 | 3 | 2 | 5 |
| | BUR | 2 | 1 | 2 | 5 | 1 |
| **0.2%** | MAL MIS 3 DV | 0.0% | 0.5% | 0.0% | 0.5% | 0.0% |
| | MVM | 0 | 1 | 0 | 1 | 0 |
| | BUR | 0 | 0 | 0 | 0 | 0 |
| **2.2%** | MAL MIS 3 (NON DV) | 3.0% | 2.0% | 1.4% | 1.6% | 3.4% |
| | MVM | 2 | 3 | 3 | 0 | 5 |
| | BUR | 1 | 1 | 0 | 3 | 2 |
| **38.6%** | Theft 3 | 24.8% | 32.7% | 48.2% | 35.1% | 44.2% |
| | MVM | 16 | 38 | 72 | 37 | 61 |
| | BUR | 9 | 29 | 35 | 28 | 30 |
| **3.0%** | Hit & Run (Att & Unat) | 4.0% | 2.4% | 2.3% | 2.7% | 4.4% |
| | MVM | 3 | 4 | 4 | 4 | 7 |
| | BUR | 1 | 1 | 1 | 1 | 2 |
| **1.6%** | Reckless Driving | 2.0% | 2.0% | 0.9% | 2.7% | 1.0% |
| | MVM | 0 | 3 | 1 | 3 | 0 |
| | BUR | 2 | 1 | 1 | 2 | 2 |
| **3.6%** | Crim Tres 1 | 1.0% | 3.4% | 5.0% | 2.2% | 4.9% |
| | MVM | 0 | 2 | 8 | 2 | 3 |
| | BUR | 1 | 5 | 3 | 2 | 7 |
| **4.2%** | Crim Tres 2 | 5.9% | 3.9% | 4.1% | 4.9% | 3.4% |
| | MVM | 5 | 5 | 6 | 6 | 7 |
| | BUR | 1 | 3 | 3 | 3 | 0 |
| **0.9%** | DWLS 1 | 0.0% | 1.0% | 0.9% | 1.6% | 0.5% |
| | MVM | 0 | 1 | 2 | 2 | 0 |
| | BUR | 0 | 1 | 0 | 1 | 1 |
| **1.0%** | DWLS 2 | 0.0% | 1.0% | 0.5% | 2.2% | 1.0% |
| | MVM | 0 | 1 | 1 | 3 | 1 |
| | BUR | 0 | 1 | 0 | 1 | 1 |
| **4.5%** | DWLS 3 | 4.0% | 4.9% | 4.5% | 5.4% | 3.4% |
| | MVM | 2 | 7 | 6 | 7 | 6 |
| | BUR | 2 | 3 | 4 | 3 | 1 |
| | | | | | | |
| | % of Firm Caseload for 2015 | 10.99% | 22.31% | 24.16% | 20.13% | 22.42% |

III.     **Complaints and Complaint Process**.

      *A.*       *Process Now in Place*.

As required by the Court's Memorandum of Decision, I established a process for receiving complaints and comments about the public defense system.  That system includes the "Comment" form (*see* English version of Comment Form attached as Exhibit 3 to the Report) provided to each client when he or she is assigned to Mountain Law.  The Comment form, available in English and Spanish, tells the client how to contact me by either leaving me a voice mail, sending me an email or writing to me on forms clients are given when first assigned an attorney.  Both Cities now include information about how to contact me, as well as about public defense, on their City websites.  Once the eligibility screening issue has been resolved the Cities plan to include information related to screening on their web pages and will finalize translating all public defense information into Spanish.

At one point, one of the City's web pages required a commenter to provide a name and case number.  This is a barrier for anyone who has difficulty reading or who wants to comment or send an observation, but cannot provide a cause number. The City promptly removed that requirement when I pointed it out.  Monitoring the web page, comment forms, and other communications about public defense to see that they are in good operating order should be included in the duties of the Public Defense Contract Administrator.

      *B.*       *Complaints and Comments Received to Date*.

Since my last Report I have received five comments.  Two were requests for information, one of which was from the parent of a client.  One was a comment on how the Cities might approach charges of Driving While License Suspended, particularly when the defendant is very young.

Two were substantive complaints.  One focused on what the client viewed as disrespect by the attorney.  The second, which involved a different attorney, also involved what the client viewed as a lack of respect by the attorney and a failure to investigate the case.  In each case I

reviewed the case file, communicated with the clients (in four of the five cases), spoke with Mr. Laws, and met with the attorneys.

Mr. Laws and I met together with one of the attorneys regarding the complained-of "disrespect" and discussed better ways to communicate with clients, particularly clients who are upset.  Mr. Laws and I have spoken about the second case and agree there were shortcomings in the lawyer's communications with the client, though we have some disagreement about the appropriate next steps.  Details of these comments/complaints are contained in the Client-Related Information filed under seal with this Report.

**IV.    Future Steps and Other Issues.**

As I continue to work with the Cities and Mountain Law, I request that the Court reduce the number of cases to be reviewed quarterly from 15 to eight cases per attorney and that the number of cases to be reviewed every six months be reduced from 50 to 30.

I also ask the Court to confirm that my appointment is for three years beginning March 31, 2014, and ending March 31, 2017.  (The Court in its December 2013 Memorandum of Decision retained jurisdiction for three years.)  I do not foreclose the possibility I may recommend the Court end my Supervision in less than three years, but at this point feel the full three years is likely to be appropriate.

The Cities continue to work on building a strong public defense system.  The three major outstanding issues identified at the beginning of this Third Report—developing a strong conflict panel, broadening the access to counsel now restricted by the screening process, and creating the means by which the Cities will monitor their public defense system—were all identified in my Second Report.  The Cities have taken steps toward resolving these issues, but must continue that process.

Mountain Law continues to improve its procedures and identify training for its attorneys and staff.  It should continue to seek improved attorney and staff performance, through efforts

including relevant training in the Rules of Evidence and the issues discussed in the Client-Related Information filed under seal as Exhibits 4 and 5 to this Report.

# Exhibit 1

**CITY OF BURLINGTON**
**CITY OF MOUNT VERNON**

**REQUEST FOR QUALIFICATIONS**
**TO PROVIDE CONFLICT COUNSEL PUBLIC DEFENDER SERVICES**

**PURPOSE**

The City of Burlington, Washington and the City of Mount Vernon, Washington ("Cities") request statements of qualifications from attorneys experienced in providing Public Defender services for indigent criminal defendants. The Cities currently contract for Public Defender services from Mountain Law, LLC.  Mountain Law, LLC provides defense services for more than 1,200 misdemeanor and gross misdemeanor defendants per year.  The Cities are seeking to contract with additional attorneys to provide legal representation to defendants that are not able to be represented by Mountain Law, LLC due to a conflict.  Defendants will be represented at arraignment, pretrial hearings, trials or pleas and appeals from the municipal court of limited jurisdiction to superior court. It is anticipated that there will be between one hundred and one hundred and fifty cases per year that are represented by "conflict" counsel.  The Cities anticipate that multiple attorneys may serve as conflict counsel.

**SCHEDULE**

The Cities have an immediate need to recruit additional attorneys and/or firms that will provide misdemeanor and gross misdemeanor defense services.  As such, **Statements of Qualifications will be accepted until  the cities achieve sufficient capacity to provide said services.** Interviews of selected candidates will, if required, be scheduled as soon as possible.  Following interview, one or more candidates will be selected to negotiate contracts for provision of services.  Although the duration of contract may vary, the Cities prefer to sign two year contracts.

**SCOPE**

Pursuant to Chapter 10.101 RCW, all indigent criminal defendants must be provided with vigorous and effective legal representation, including but not limited to, the representative duties listed below in (A) through (E).  Mount Vernon and Burlington have adopted standards for the provision of public defense services as required by state law.  The Cities have adopted an un-weighted case load standard of 400 cases annually per full time Public Defense Attorney.  This standard, and those adopted by the Washington State Supreme Court, will apply to conflict counsel.  Copies of public defense standards adopted by the City are available upon request and are incorporated in the draft contract for services included in the Request for Qualifications.

Public Defense attorneys are expected to:

      (A)    attend all court hearings required by the Washington Court or Local Court Rules now or hereafter adopted;

      (B)    appear and represent clients/defendants at all hearings and trials involving defendants on whose behalf the Public Defender has been appointed;

      (C)    be available to talk with and meet, in person, eligible indigent defendants at the Skagit County jail, and an office location in either the City of Burlington or the City of Mount Vernon. Confidential meeting space that is ADA compliant is required;

      (D)    research the law and investigate facts in a manner appropriate to each case; and

      (E)    document and report selected data to the Cities regarding represented cases on forms prepared by the Cities (monthly and quarterly reports as required).

**SUBMITTAL PROCESS**

Interested applicants should provide a resume, cover letter, solely authored writing sample, a list of the past two years CLE's of other trainings that relate to criminal defense, names of judges and opposing counsel in the last three cases that went to trial and any other information the applicant feels demonstrates his/her ability to provide vigorous and effective representation to clients.

**Responses must be marked "Burlington and Mount Vernon Indigent Defense Qualifications" and be sent to the City of Burlington, 833 South Spruce Street, Burlington, WA 98233. Questions regarding this RFQ may be sent to bharrison@burlingtonwa.gov or erics@mountvernonwa.gov.**

# Exhibit 2

**CITY OF BURLINGTON**
**Job Description – Public Defense Program Assistant**


**JOB TITLE:**              Public Defense Program Assistant
**DEPARTMENT:**             Administration/Finance
**CLASSIFICATION:**         FLSA eligible, Non-Represented Position
**REPORTS TO:**             City Administrator (programmatic) / Finance Director (operational)
**HOURS PER WEEK**:         Less Than Full Time, Estimated 20 hours / week
**Wage Range:**             $15 - $20 / hour depending upon experience


<u>**Summary**</u>:

The Public Defense Program Assistant conducts indigent defense financial determinations (screenings) of defendants that have criminal cases filed in one or more Municipal Courts and request provision of a public defense attorney.  The Public Defense Program Assistant will also provide administrative support to, and coordination of, public defense attorney contract compliance under the direction of the City Administrator and/or Finance Director.  Duties include interviewing applicants who have requested a public defense attorney and determining whether they are financially eligible to receive a public defense attorney, receiving reports from contracted public defense attorneys and determining compliance with reporting requirements, receiving and directing complaints pertaining to the municipal public defense system to the appropriate review authority, and maintaining detailed public defense system administrative and contract records.  The person filling this position will also receive reports and documents submitted to the city/(ies) by indigent defense contractors and, under the direction of the City Administrator, will review those reports for compliance with contract and reporting requirements.


<u>**Essential Functions:**</u>

Essential and other important responsibilities and duties may include, but are not limited to, the following:

1. Answer questions in person, over the phone, and electronically from defendants and others who inquire about public defense services.


Public Defense Program Assistant November 12, 2015 *public defense program asst. job description 1 2015*

2. Serve as the primary contact for receipt, distribution and tracking of questions, concerns and complaints regarding the city(ies)' provision of indigent defense services.

3. Interview defendants, review financial information and affirmation(s) of validity to determine eligibility for Public Defense Services.

4. Assign or deny a public defense attorney based upon established screening criteria. Contact Public Defense contractors regarding assignments in a timely fashion.

5. Prepare promissory notes if and when applicants are determined to be indigent and able to contribute to the cost of defense. Screen for financial ability to contribute based upon applicable private counsel cost estimates.

6. Maintain confidential administrative files of defendant interviews, and prepare electronic spreadsheets and statistical reports tracking caseloads.

7. Provide information to clients regarding Social Services.

8. Provide staff support for innovative alternative sentencing programs, including but not limited to, relicensing initiatives and related efforts on behalf of the city.

9. Coordinate assignment of conflict counsel when required.

10. Receive monthly and quarterly reports from indigent defense contracted providers and review for contract compliance.

11. Review city information systems pertaining to indigent defense and ensure accessibility and operability.

12. Update city /(ies) public defense website(s), and ensure that public defense information, web-links and forms (both electronically and paper based) are readily available, written and functioning as designed.

13. Participate in training related to the position.

14. Perform screenings during municipal court days in absence of court screener, or when not provided by contract.

15. Act within the scope of his or her responsibilities, working as a public employee and municipal officer with courtesy and professionalism, and adhering to the highest standards of ethics in accordance with RCW 42.52.

16. Perform other miscellaneous, clerical and program support duties as assigned.

**OTHER DUTIES & RESPONSIBILITIES**:

Performs other related duties as required.

## SKILLS, KNOWLEDGE AND ABILITIES:

**Knowledge/Abilities Required:**

1. Excellent Written and Oral Communication Skills.
2. Ability to deal with Challenging and Stressful Situations.
3. Ability to Maintain Confidentiality.
4. Organizational Skills.
5. Attention to detail.
6. Ethical Conduct.
7. Able to speak and write with proficiency in the English and Spanish languages.

## EDUCATION AND EXPERIENCE:

Requires High School Diploma.  Associate of Arts degree with coursework in finance/accounting, social work, or psychology and two years of responsible independent legal or clerical office work experience; or any combination of education, training and experience which demonstrates the ability to perform the essential functions of the job. Experience within a legal office environment preferred.  Employee must be bi-lingual (fluent in Spanish).  Employment is subject to a criminal background check and submission of writing sample in English and Spanish demonstrating language proficiency.

## Supervisory Responsibility:

This position has no direct supervisory responsibilities.

## WORKING CONDITIONS:

This job operates in an office environment dealing with a diverse population from varying economic backgrounds. This role routinely uses standard office equipment such as computers, phones, photocopiers, filing cabinets and fax machines.

**PHYSICAL REQUIREMENTS:**

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.

This position requires frequent sitting, standing, walking and bending.  The employee is occasionally required to lift objects weighing 10-20 lb. Requires continuous wrist and finger movement.  Requires the ability to communicate professionally, both orally and in writing.

**Required Education and Experience:**


The City of Burlington is an equal opportunity employer.

Please note this job description is not designed to cover or contain a comprehensive listing of activities, duties or responsibilities that are required of the employee for this job. Duties, responsibilities and activities may change at any time with or without notice.
Signatures



Employee signature below constitutes employee's understanding of the requirements, essential functions and duties of the position.


Employee_____ Date_____

Public Defense Program Assistant November 12, 2015   *public defense program asst. job description 1 2015*

# Exhibit 3

 **City of Burlington – PUBLIC DEFENSE**
**COMMENT ▪ COMPLAINT ▪ QUESTION FORM**

☐ The Public Defense Supervisor (PDS) wants to hear your comments about your public defense attorney, about how you apply to get a public defense attorney, or about your experience in Burlington Municipal Court.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

☐ If you want to talk with the PDS please give a phone number or email address.

_____    _____    _____
Name                                       Date                                     Burlington Court Case Number

Check box for best way to reach you:

☐ _____       ☐ _____
   Phone Number                             Email

☐ _____
   Mailing Address (including city/state/zip)

| **YOU CAN:** |
| --- |

➤ Leave your comments in the ***Comment/Complaint/Question drop box*** in the lobby of City Hall (833 S. Spruce Street), across the parking lot from Burlington Municipal Court

➤ Fold and mail your comments to the PDS *(must put stamp on)*

➤ Scan and email to:  publicdefense@burlingtonwa.gov

➤ You may also leave a message for the Public Defense Supervisor at (360) 755-2338 or send an email message to:  publicdefense@burlingtonwa.gov

3. Tape here

2. Fold on dotted line

Return
Address: _____
         _____
         _____

PLACE
FIRST CLASS
POSTAGE
HERE

CITY OF BURLINGTON
PUBLIC DEFENSE SUPERVISOR
833 SOUTH SPRUCE STREET
BURLINGTON WA  98233

1. Fold on dotted line

# Exhibits 4 and 5 FILED UNDER SEAL